Before we get started, we have an order which indicated the sequence of proceeding. We will allow each side 20 minutes, and then each side will have 5 additional minutes for rebuttal only. Thank you, Your Honor. My name is Sean Hood on behalf of Freeport Minerals Corporation. In terms of our 20 minute allocation on our side, I have 15 minutes. Mr. Eckstein will follow with 5, and I'll do my best to keep track on that. While Freeport cross-appeals certain rulings of the District Court below, for the most part, the reason that we're here, the District Court requests that this Court affirm Judge Golden with respect to her determinations on forfeiture, and for the most part, abandonment. I'll talk about something where we don't agree with what she did on abandonment, but by and large, I think she got the law right. The importance of these issues of forfeiture and abandonment extend well beyond the three remaining applications that we're here to talk about today. First, we believe that Judge Golden's forfeiture analysis should be affirmed in all respects. A different outcome would be inconsistent with this Court's prior precedence, under an analytically identical savings clause to abandonment, and it would also carry dire consequences for water users throughout Arizona. On the second point, again, Judge Golden's abandonment rulings follow the law. For the most part, there's one area where we don't believe she adequately evaluated Freeport's evidence of intent with respect to 1.4 acres. So you have one problem, do you not? And that's San Carlos. Had she traveled to the Arizona Supreme Court case? No, Your Honor. I'm prepared to discuss San Carlos. It is a case that the objectors rely on so heavily. And San Carlos... I mean, I would know you to respond. I'm certainly prepared to do that, Your Honor. And Judge Golden had it exactly right. The Arizona Supreme Court in San Carlos did not reach the question about whether forfeiture applies to pre-1990 rights. Simply did not reach that question. Judge Golden had that exactly right. And when you take a step back and look at the proceedings there, and Judge Golden hits an interesting coincidence, she's the trial court judge in that special action. That special action was initiated to evaluate the constitutionality of the 1995 amendments to Arizona's Water Code. And both Judge Bolton at the trial level and the Arizona Supreme Court on review did the two-step process in analyzing the constitutionality of those amendments. Number one, are these amendments intended to be applied retroactively? Very clearly, based upon the plain language of the amendments, they were intended to be applied retroactively. So the next step is, is the amendment merely procedural, or does it affect substantive rights? If the former, it may pass the Constitution muster. If it is intended to affect substantive rights, that is a violation of due process. Neither court reached the issue about whether any particular amendment actually affected a change in existing law. Simply did not reach the issue. And this is clear on the face of Judge Golden's order. She says that issue will have to be reached when we're presented with a particular case in controversy. And she said, yes, in fact, the parties argue various reasons why the amendments were constitutional. One of those grounds was we're not really changing the law here, we're simply codifying it or clarifying it. She said when presented with a particular case in controversy, it may be the fact that the amendment is merely restating the existing common law. However, did not reach that question. In terms of the Supreme Court's analysis, very clearly, when you look at paragraph 17 of the San Carlos decision, that is the sum total of the analysis related to the amendments to the forfeiture provision. And that forfeiture provision is ARS section 45-141E. Two or three sentences, absolutely no analysis about whether forfeiture applies to pre-1919 rights, no discussion of Arizona Savings Clause, which is analytically identical to the Nevada Savings Clause. Simply did not reach the issue. And, Your Honor, Judge Gold, the paragraph that really underscores what the Arizona Supreme Court was doing and what it was not doing, namely, was not reaching the question about whether these amendments were changing the law. Two paragraphs later, paragraph 19, and here, the Arizona Supreme Court evaluated an amendment, section 45-162B, and the issue there was, does a delay by the Arizona Department of Water Resources in processing application to appropriate have any impact on the priority date? And the Arizona Supreme Court observed, we don't think that changes anything. We think the date of filing is your priority date. Under existing law, the amendment doesn't change that. Maybe it reinforces that. The court did not reach the question and struck down the amendment, even though it observed, in all likelihood, it was not a change in law. So, again, the Arizona Supreme Court did not reach the question. Judge Bolton did not reach the question. Her analysis in this case is absolutely correct. We have a Nevada Savings Clause issued by this court on multiple occasions that is analytically indistinct from Arizona Savings Clause. No objector takes the position that there is any meaningful distinction in the language of those savings clauses. So there's no reason to deviate. The Arizona Supreme Court did not reach that issue. So the actual relevant cases here, in terms of what that Savings Clause means, either a man sprang from the Nevada Supreme Court, or it was the Arizona Supreme Court that actually did evaluate the meaning of the Savings Clause. And then this court's precedence. You have an iterated overwater ditch. You're not iterating an overwater ditch. Expressly evaluating the meaning of the very words that are functionally identical to those in Arizona, and the meaning of those words, the reason that the legislature put those into the Act in the 19-teens, was to ensure that pre-existing water rights would not be impaired. A water right that previously is not subject to forfeiture and now is, is something less than it once was. And that is the reason for these savings clauses. That is the analysis of this court in overwater ditch. And these three, the Alpine cases, Alpine 3, Alpine 6, and Alpine 7, and in remands. So Judge Bolton had that exactly right. The Arizona Supreme Court in San Carlos struck down a variety of amendments, many of which probably don't really change Arizona law. However, they were new amendments, new language, drafted out of these statutes, clearly entitled to be applied retroactively. And because they affected substantive rights, that is a due process violation. The court did not reach the question of how many of these are changing. What's your position about, even though it doesn't apply to pre-1919 law, that going forward, that the law would apply? In other words, just the normal law. If you don't use it, you forfeit it. Judge, if I understand your question, you're asking, why is it even if the savings clause applies to pre-1919 water rights, why does that impact, for instance, after 1919? Right. Okay. Well, I'm glad I'm not relying on Third Circuit law. I'm relying on your circuit's law, Your Honor. The meaning of the savings clause is when it says, not in the care of vested water right. Again, a water right in 1910, when someone goes out and appropriates a water right, it's not subject to forfeiture. If in 1925, he is unable to make use of water for some reason, that water right is not the same. It is impaired. It is not the same as it once was. And this court has made that same reasoning with respect to Nevada's savings clause. Which case? Or water ditch? Or water ditch, as well as at least one of those three Alpine cases addressed that issue. And clearly, the Nevada Supreme Court goes through that in great detail, and that's the Nevada Supreme Court case. I don't want to move on to O'Bannon, but if you have more questions about forfeiture, because this is the big one from our perspective, and I think from everybody's perspective. Councilman, let me just throw in a curveball here. Do we have jurisdiction over this case? Yeah. Just in very brief, I think you're going to hear more about jurisdiction than the others, frankly. Freeport's position, very clearly, Judge Bolton, entered a final order in this case. I don't think any party who is going to be speaking with you today disagrees that Freeport's application is private for this case. Well, I guess my question is, do we have jurisdiction over all of the appeals in all of the parties? And I'm wondering why there's no 54B certification. You're going to hear from Mr. Eckstein, his view on some of his client's applications. And Freeport, frankly, doesn't weigh in on that, doesn't take a position. Oh, okay. But certainly, as it relates to Freeport's applications, they are all before you, and I think every council that we hear from will agree on that point. All right. We'll ask Mr. Eckstein. Great. Go ahead. Hearing no further questions on forfeiture, I'll turn to abandonment. The district court correctly determined that Freeport had no intent to abandon its lands that had been overtaken by the Gila River during very significant flooding events. And one of these occurred circa 1991, and that's the date that kept coming up in many of our discussions. Here, the district court made a factual finding based upon the evidence and the record of actual intent. And so the objector's burden here with respect to these river bottom lands is to demonstrate to you that Judge Bolton's determination is clear here. And this they cannot do. The objector's only evidence at the trial court level was a prologue to not use of the decree parcel. And that, of course, is a function of the river moving, not anything the farmer did. Well, with respect to that, perhaps this is true. As I understand it, applications 115, 147, and 151 have all been withdrawn. Am I wrong on that? That is correct. So this is a moot issue. There are forfeiture issues as well. I'm talking about abandonment. You're right. No, I believe that some of the applications that are preserved that were not part of the 10 test cases and there hasn't been full discovery on those. But I believe that some of those applications do involve lands that are river bottom. And the objections to those were withdrawn subject to this appeal. And so essentially, I know it's complicated. We were here with you five years ago. And as you'll recall, there was cooperation with the objectors to try and do this in a way that would make sense. And what the parties agreed to was withdrawal of these objections. Let's get all of this in front of the court in an orderly fashion. So there are applications. Perhaps not the three that were test cases that remain. There are applications. How do you deal with the applications that are in front of this court? All of those, all of 3.59 applications are before this court. Have you argued even those that were withdrawn? Several of them were deemed denied for the reasons set forth in the 2010 free court order. That's a seven. No, that extends beyond the seven. Oh, right, right, right. 49. Correct. Okay, the 49. So that's off on one side. The focus was on the 10. As I understand it, three of those have been withdrawn. Am I wrong? No, the way around. There's three remaining. Seven were withdrawn because those lands ended up being included in Covenants Not to Irrigate, down to five. Okay. So I know it's very complicated. To that same point, the right of my notes, the free court conceded in its opening brief that application 147 is in votes now moved and not subject to this appeal. It's in the red brief at 25. And also, application 151 is also moved and not subject to this appeal. That's the red brief. And also at 25, do you agree with that? I agree that what you're reading is correct. We filed a notice of errata just earlier this week. As I was preparing for this, I realized that application 147 is actually not among those lands subject to the Covenants Not to Irrigate. So application 147, it's outmoded in that sense. We're not coming in here today to appeal for denial of that application. I don't think that would have been fair. You said you don't have jurisdiction over it, is that what you said? You do have jurisdiction over that application. And certainly the abandonment issue on the 1.4 acres, that relates to application 147, 2008-147. So it is before you. We are not requesting reversal or denial on that application. Because in our opening brief, we said we weren't going to do that. It's too late to change that. So it is before you, Your Honor. The abandonment ruling is before you. And it's not mooted in the sense that there's been some waiver of the rights on that land. That clarification was made earlier this week. So turning back to evidence of intent with respect to the river bottom lands, again, the only evidence of an intent to abandon was the prolonged period of non-use, and that's because the fields were rendered non-irrigable by movement of the river. There's no fault to the farmer, the irrigator, the breed right holder. The court properly weighed that one piece of evidence against several pieces of evidence that clearly demonstrated Freeport's intent to maintain its water right and not abandon it. That includes the fact that Freeport acquired these farms for the sole purpose of acquiring their pertinent degree of water rights. Freeport paid all of its water assessments, maintained all of its ditches and roads, and paid all operation costs. So this was a factual finding following the law of abandonment, which, again, happens to be very similar in Arizona and Nevada. You're supposed to look at all surrounding circumstances. She did that. She determined that the objectors did not demonstrate an intent to abandon, and that covers all of the river bottom lands. And, again, so that one is a clear error standard, and the objectors can't beat that. The one disagreement that Freeport has, it comes back to Application 147, and here what seems to have happened is Judge Bolton looked at this court's She gleaned a lot of guidance from those cases. Again, perfectly appropriate. The problem that we have with this one particular parcel is Judge Bolton applied essentially a legal standard that she derived from Alpine 4, and she only looked at three pieces of evidence. And here the only things that Judge Bolton looked at was a prolonged period of non-use and improvement inconsistent with agriculture. There was a farm road constructed, apparently in connection with the river moving. So, there's facts as to the remaining area of the land. And then a delay in filing certain transfer applications. Now, those three facts are relevant. Certainly no problem with her taking a look at those. The problem is, while those were the three relevant facts in Alpine 4, those were but a subset of the relevant facts related to Freeport's applications and its intent. And so what is very clear when you look at pages 48 and 49 of her order on the Freeport applications, she did not look at the other evidence, the countervailing evidence on the other side of the ledger demonstrating that Freeport did not have an intent. She found many of those facts elsewhere in her opinion, but if you look really closely at exactly what she did in determining that these 1.4 acres were abandoned, she looked at those three facts and none other. And so the other ones that needed to be looked at, there's two periods of time here. So, yes, there was a farm road, and there was a prolonged period of non-use, and the separate transfer application was not filed until 2008. Again, perfectly fine to look at those facts. They are relevant. However, what also needs to be looked at? From 1991, when the river moved, through 1997, every decreed right holder received a full publication of his or her water rights at all times, even if that irrigator was cultivating some of what's in its full decree dictionary. And that was a practice dating all the way back to 1935 when the decree was practiced and administered by an officer of the court, the water commissioner. And there can't be no inference of intent of abandonment when someone is actually making use of the water on decreed lands. I know you wanted to focus exclusively on the forfeiture and the banishment issues, but I, because this has been called straightforward in a major way, I wondered if you could just comment briefly on whether the district court heard on its determination that your client failed to fulfill its burden to present a prime evasion case demonstrating that its separate transfer applications would not injure the rights of other decreed parties. Sure, sir. Thank you. A priority forfeiture one, abandonment two, and the prime evasion issue is my 30th year, Your Honor. I'm happy to address that. I know we have time, but we have talked about it. That's an important issue. I will certainly do my best. So the issue here is what is the meaning of an initial prime evasion burden? An initial prime evasion burden does not require proof beyond reasonable doubt. It does not require clear and convincing evidence. All a prime evasion burden requires is sufficient evidence to permit, not to compel, but to permit the inference that the San Carlos Apache tribe would not be harmed by these applications. Freeport met that burden in terms of water quantity at all times under the existing condition and the proposed condition. Freeport's rights are always junior to the tribe's, and we have a call system administered by an officer of the court at any time the San Carlos Apache tribe places its call. It must receive the full allocation of its call before Freeport receives a drum. That's two, whether Freeport is irrigating the proposed place or the prior existing place of use. Why should there be a need to call? Doesn't it mirror the construction of diversions in and of itself create the problem? Well, Freeport has a right and an entitlement under the decree to irrigate the acreage and the informatics. The question is, does it injure the tribe because you're irrigating one parcel versus another? And the answer is no, even if you assume that there's some small change in return flows. That's sort of the argument as well. If you're irrigating here and then you move it to this location, there's no question Freeport has a right to irrigate these acreages. Anything else would be a collateral attack on the decree, and this court has found that. This is not an issue about the presumption of irrigation harm the tribe. That's a collateral attack on the decree. Freeport has a right to irrigate its decreed acres. The question is, does irrigating a place A versus place B harm the tribe? No, where did Judge Bolton go wrong? Where Judge Bolton went wrong. And see, by the way, she got that right, that that's a collateral attack on the decree to say, were you injured because you hadn't been irrigating, now you want to start irrigating again. That's not a valid objection. Where Judge Bolton got it wrong from our perspective, respectfully, is the district court held Freeport to something more stringent than initial time of pasture burden. Freeport came forward with all of the legal protections afforded to the decree, the priority system, the call system, the water quality injunction, and all of those things demonstrate that the likelihood of the tribe being injured is very small. Now, that's not the end of the story. The tribe gets to put on evidence that it's actually being harmed. When that burden actually did shift, the San Carlos Apache tribe put on injury experts from Stetson Engineers. Stetson Engineers was paid $400,000 in connection with the trial court proceedings. Could not generate one opinion of actual specific harm with respect to any of these applications. And if that level of consulting work was in the context of an actual harm situation, you would have had opinions about this application is causing X and this application is causing Y. I'm alluding to the fact that you've only got five minutes left, and I think your co-counsel would like to. I'm committed to yielding to him, unless there's any further questions at this time. Thank you all. Thank you for saving us. As a matter of clarification, the five minutes includes the rebuttal time, does it not? Did we start with 25 minutes? I think we did. Did we start with 25 minutes? Yes, we did. We did. I was getting anxious. He's been ready to go for 30 minutes. All right. Thank you very much, Your Honor. It's probably a worthwhile investment of study, because these are very complex issues. We understand. I didn't notice you. That's fine. That's fine. Anybody else? Good morning. May it please the Court. My name is Paul Eckstein. I'm a jury on behalf of the Franklin Irrigation District, the Gila Valley Irrigation District, and the farmers in the upper Gila Valley. I'm alerted to the fact that you might tell us about jurisdiction. Yes. I think it really starts with and maybe ends with the Congress versus London case, the 1993 Ninth Circuit case, which looked at whether voluntary withdrawals was an order from the Court under Rule 41 created jurisdiction. And the Court said it did not. If it was an involuntary dismissal, or if it was a voluntary dismissal with prejudice, it made a difference. But these are voluntary dismissals without prejudice. My clients have 300 and a half to 360 applications for severance and transfer. They were all voluntarily withdrawn. So under the law of the Ninth Circuit, in terms of the London, which the community doesn't respond to, and which the federal parties give the back of their hand, there's no jurisdiction. I don't think there's any serious question about that. I suppose we could grant them, grant their motion to treat the opening brief as an amicus brief. Does that make sense? Well, whether to treat our brief as an amicus brief or a brief of the party doesn't really matter. The scenarios are made. But we don't have jurisdiction in respect to those. What about the segregation of the applications into a subset of the district court? As I understand it, there was no Rule 54 certification made. They were segregated, but they weren't joined with the subset. So the subset, 10 of those were tried, 10 applications were tried. Do we have a modality with respect to those? Yes, you do. I think you absolutely do, because those were not voluntarily withdrawn without prejudice. So there are a number of ways in which you can handle it. And beside that, sever off the 360. The federal parties in the community recognize that this isn't going to be binding to whatever decision you make. It will be binding on the facts of the issues, what the community says. It goes without saying, this is in the context of their abandonment claim discussion, that this court's judgment, therefore, will be limited to three courts' applications. So there is an end out that because they were voluntarily withdrawn, it can't be part of this case. It's not appealable. I want to say two things following up on forfeiture, and they're both in our briefs. Number one, in our brief and in the Salt River Project brief, attention was called to Article 17, Section 2 of the Arizona Customs Act, which has not been interpreted, but it does say, all existing rights to the use of any of the waters of the state for all useful or beneficial purposes are hereby recognized and confirmed. And the argument is, as we set out in our brief, that there's a constitutional protection and a deed to the man's spring and other protections. Finally, there is a set procedure for forfeiture under Arizona law. It's in 45-189, and it sets out in great detail who has the power to make the forfeiture. And that power is visited with the director of the Department of Water Resources. He's the one who has that power. The judge sitting in this case has the power to determine all other issues with respect to severance and transfers, but not whether there has been forfeiture. It's an elaborate procedure. The parties talk about the various parts of 189 and how they apply and how they don't apply. I don't think you can pick and choose. 189 is a law that sets out a detailed procedure that hasn't been followed in this case. Thank you very much. Thank you, counsel. We'll hear from the other side. My name is John Smeltzer for the United States. I'll be sharing time with counsel for the San Carlos Apache tribe. We'll be taking five minutes. Counsel for the Gila River Indian community, we'll be taking ten minutes. And I'd like to start with five minutes of the opening argument and five minutes of rebuttal. Counsel, let me just ask, as between Mr. Sparks and Mr. Shaw, which are the clients of their representatives? Mr. Sparks is with the San Carlos Apache tribe. Mr. Shaw with the community. Can you remind me again the allocation of time between the community and the tribe? Five for the tribe and ten for the community. Very well. Thank you. Thank you, sir. Your Honor, let me start with the question of opinion or forfeiture. So I want to start the discussion. And I want to begin with the San Carlos Apache tribe case because we do believe it is the more important precedent for this court, in fact, the only precedent that is controlling. And I want to draw the court's attention to the opinion, and I quote from the opinion at 932 Pacific 2nd, page 193, where the court quotes from a prior decision of the Arizona Supreme Court. And the court says, quote, when an amendment, and they're talking about the 1995 act now, when an amendment is enacted after a considerable length of time and constitutes a clear and distinct change of the operative language, it is an indication of an intent to change rather than clarify the previous statute. If you could also give us the site again. It's 972 Pacific 2nd on page 193, Your Honor. 193. Thank you. And there the court is acknowledging the Arizona Supreme Court that there is a fundamental difference in the language of the 1995 act, which purported to provide a clear exemption to pre-1919 water rights from the operation of the rule of forfeiture, versus the language of the 1919 Savings Clause, which did not. And the court is recognizing, and as it did, it declared the prior or the 1995 act unconstitutional because it would change the law because there were rights that could have been forfeited in the interim because the original 1919 Savings Clause did not make rights pre-act, pre-1919 rights immune from the purely prospective application of the rule of forfeiture. And so, you know, we believe St. Carlos controls on that point, but either this court determines, as Mr. Hood argued, that St. Carlos doesn't control, certainly Mance-Spring does not control this court's determination of the issue either. Mance-Spring did interpret a similar statute, but Mance-Spring interpreted Nevada law, and all of this court's precedents in the Alpine case and the Orchidge case were simply following the Nevada Supreme Court's analysis of Nevada law, as this court was required to do. None of that means that this court is then required to follow Alpine and Orchidge in its application of the Arizona statute, and as we explained in detail in our brief, the fundamental error the Nevada Supreme Court made, if you're trying to take that precedent and apply it to Arizona law, was to presume that there was a fundamental change in the law at the point that the forfeiture statute was codified. As we explained in our brief, preexisting Arizona law was dependent on the principle of beneficial use and a notion of reasonable diligence, and use or lose was already part of the preexisting Arizona law. It was already featured in case decisions with respect to adverse use. There was already a preexisting statute, the 1893 statute, which codified this in part with respect to the time between full state and the use of that. And so there was already the preexisting duty of due diligence, and other state courts have recognized that where there is a preexisting duty of due diligence, when a legislature that codifies that duty of due diligence in a forfeiture provision, that is simply codifying a preexisting requirement of the law. It is not an impairment of a vested right, because there was no expectation preexisting at the time. And also, is this an issue that we should certify to the Arizona Supreme Court? San Carlos is already decided.  Interpreting San Carlos, and then in the context of the additional explanation that we provide, is this an issue that this court is fully able to interpret and determine in the context of its jurisdiction over the federal rights that he was decreeing? Unless there are further questions on forfeiture, I'm going to defer Mr. Swartz very well. My name is Joe Swartz from the San Carlos Betsy Tribe. I have five minutes to discuss why, in our opinion, and the court should affirm the trial court's decision on the issue of the requirement to prove no harm to other right holders under the decree when someone has to amend the decree by changing their description of their decree under the decree. As you know, pardon me, the decree sets out in minute detail the elements of the decree, and there is one way to amend the decree, and that's under Article 11, which appears at page 112 of the decree. The last sentence of Article 11 says that a party may change the place of the decree under the decree, and there is a second type of use providing that party can prove to the court that it will do no injury to the rights of others under the decree. The procedural rule was adopted in 1993 to provide a due process, a uniform process by which applications to amend the decree could be considered. And in that rule, the court repeated on an adoption at Part 4 for the duty on the applicant's part to provide a private agency proof, evidence that it would not do injury to the rights of others if the ---- So under the terms of the decree, is it correct to state that Article 11 puts the burden on the moving party, that is the party that wishes to change the decree to satisfy the obligation of no other? Yes. Are you asking me is that correct? Is that correct? Yes, that is correct. So when we look at Judge Bolden's analysis, we should understand it in terms that she understood that, in this case, Freeport had the burden of proof to show that there was no harm. Yes. And so ---- And failed to meet it, and failed to meet the rule. That was Judge Bolden's assumption, and the procedural rule adopted for the applications. And change in this rule, use rule, also assumes the burden is on the applicant, and will get some amount of equity if the party wants to change the rules. It must show both actually that it will not injure others, and the equitable result is required under the decree. And therefore ---- Pardon the counsel. I'm sorry. I'm trying to fix the case. Judge Bolden. Judge Bolden is asking you a question, counsel. Yes. Isn't there a burden? Justice ---- On the video, counsel. I'm trying to fix the case. My understanding, my understanding of your question, Judge, is that the fact show, the fact show ---- If I step away just a little bit from the mic, I think that's fine. My understanding is that the factual evidence is the burden is on the applicant to provide factual evidence to show how the river will function differently after the application is granted, and that that functional difference in the river will not harm or injure the rights of another. And that's exactly what the rule says. And in the applications, the judge understood that and went minutely into each of the applications, every line of the applications, to determine whether it was reported provided the court with any evidence that he could use to analyze whether or not the function of the river would change to injure the rights to others. And in the trial of the matter, she also went through all of the evidence provided in the trial of the evidence to determine whether or not the report had provided any evidence that would fulfill the initial obligation to provide a primary facing fact showing that there would be no injury to the others. Therefore, finding that there was no individual individual information about each application and its functional effect on the river, that she must deny, did deny each of those. She went then through the cumulative injury issue and said where there's multiple applications filed at once, it is only reasonable and equitable that all of the cumulative effect of those applications be considered. And it would render the rule of Article 11 the only one that allows amendment of decree meaningless if the applicant did not file that application and there was no basis for effect by the court. My time is up, Your Honor. Thank you for your service to the court. Thank you, counsel. Mr. Shaw. May it please the court that the H. Shaw for the Kela River Indian Community. I'd like to start out by addressing forfeiture, which I think from Kela's perspective is the big ticket item. Your Honor, Mr. Hood's stated the law of retroactivity to you and said that the Arizona Supreme Court in the San Carlos decision did not reach the critical question of whether the 1995 amendment created a change in the law. But that is impossible under the law of retroactivity because a necessary predicate to finding a law retroactive, unconstitutionally retroactive, is that it would have affected a change, a substantive change would have created a new rule to the law. I'd like to point you to three excerpts in the opinion in particular that make this point irrefutable. So let's start with page 190 of the decision. And there the Arizona Supreme Court says, and I'll quote it for you on page 190, it says, I have no idea of which decision. The San Carlos, actually. The Arizona Supreme Court decision, page 190. It says, and this is the 1995 amendment, If it created a new protection, that means the preexisting regime did not provide this perpetual protection for pre-1919 water rights. So it was a necessary predicate for the statement that the 1995 amendment, which would provide the exact same insulating effect that they say has always existed under the code. What the Arizona Supreme Court said is that 1995 amendment, which would create that insulating effect, was a new protection. That's verbatim at page 190. So that was necessarily decided. You cannot say they didn't reach the issue. They clearly reached the issue and decided it. If that were not enough, if you look at the prior page in 199, 189, when the Arizona Supreme Court describes what is the law of retroactivity, it looks to the Supreme Court's president, U.S. Supreme Court's president in Lansgraf, and it quotes, it says, and I'll quote from 189, to events completed before its enactment, citing Lansgraf, and that's, of course, the Supreme Court law on retroactivity. It is only unconstitutionally retroactive and imposes a new legal consequence. The Arizona Supreme Court in the next sentence says, in other words, legislation may not disturb vested substantive rights by retroactively changing the law that applies to completed events. So it says the only way you have an unconstitutionally retroactive enactment is if it changes the law. And then on the next page, which I just read a moment ago, it says it changed the law. It created a new legal consequence. And if that were not enough to show that the Arizona Supreme Court decided the question, then on page 194 of the same decision, it says these are not mere clarifications. It said it's more akin to a change in the law, not a clarification. So we have three places in the Arizona Supreme Court opinion which it makes clear the 1995 amendment, which would accomplish the exact same definition that they said has always been a part of the Arizona Water Code, was a new protection and a change to the preexisting law. That is the only way they could have struck it down as unconstitutionally retroactive. There is no ambiguity here. The decision is clear and controlling. This Court has to follow the Arizona Supreme Court's decision. One point I... Oh, I'm sorry, Your Honor. Is your position identical to the U.S. position? Your Honor, ours is, although we focus exclusively on San Carlos Apache because we decide that the U.S. also points to the preexisting history, which interests us that, but we would just stop at San Carlos Apache because for the reasons that I explained, it conclusively decides this question. And here is where Judge Bolton went wrong, is, I think, in the understanding of the retroactivity law. As the Arizona... And it's the same mistake Mr. Hood, I think, made here. The Arizona Supreme Court got it right. We have to assume that they got the law of retroactivity right, which is to say it has to be a change in the law to be unconstitutional and retroactive. What Judge Bolton, on the other side, says, oh, we don't need to decide whether it's a mere clarification or a change in the law. That's what Judge Bolton said when she was the district court judge, or the trial court judge in San Carlos Apache. She said the same thing in the opinion in this case. But we know from all the passage that I just read that the Arizona Supreme Court, following the U.S. Supreme Court's decision in Landgraf, got retroactivity correct. You can't strike something down as unconstitutional and retroactive unless it changes the legal rule. And the Arizona Supreme Court spells that out. It's exactly correct. This is a new protection, and therefore it could not have been the case that the day before the 1995 amendment was enacted that the Arizona law already perpetually protected for any right, any pre-1990 right from forfeiture, even for five years of non-use, that happened decades after the forfeiture statute was enacted. And so we think San Carlos Apache conclusively decides the forfeiture issue and that there's no occasion for this court to look to the Nevada Supreme Court's decision in Mansi Spring. Obviously, that's a different state's law. They can interpret their state's law however they want to. All that the Ninth Circuit, all that this court was doing in Orwater Ditch, Judge Fletcher's opinion, and in the Alpine cases, was applying that Nevada Supreme Court decision, which is from 1940. And so, of course, when you're looking to Nevada law, you apply Mansi Spring. But when you're looking to Arizona law, you apply San Carlos Apache. And so we think it's plain, it's clear, and it compels the result in this case. Now, the other thing I would just note is if you rule on forfeiture that San Carlos Apache does not forever adopt our rule and not their rule, that it forever insulates pre-1919 water rights, then you don't have to reach any of the abandonment issues. Abandonment is necessarily subsumed. They're the identical claims, and there's no factual dispute about five years of non-use here. And so it turns completely on that pure question of law, what the Arizona Supreme Court decided. And that would end our entire appeal because we only raised two issues, forfeiture and abandonment. So once you decide that, you don't have to get to any of the other issues. With the remaining two minutes, I'm happy to discuss any of the other issues that this Court had otherwise. I'll sit down on jurisdiction. I would just note that I don't think there's any dispute among the parties that at least some subset of the claims are properly before this Court, and that's all you need to do to decide the forfeiture issue because forfeiture cuts across all the free court applications, and I don't think anyone is disputing that the free court applications are properly before this Court. I think they're all properly before this Court. Those that were withdrawn. Your Honor, the ones that are withdrawn are not before this Court because they were withdrawn, but the forfeiture counterclaims cut across every single one. So as long as forfeiture isn't one of those applications, you can decide the issue. And even if forfeiture weren't the one distinction I would draw, and maybe it will help clear up some confusion, forfeiture and abandonment were counterclaims. So even with respect to applications that were withdrawn, the counterclaims still survive. And so the district court ruled on some of the counterclaims, and even if some of those applications were subsequently withdrawn, that doesn't move the counterclaim. But the non-free court applicants were not proper parties. We don't think they're proper parties, as we noted in our reply brief, because they don't have any applications. They were all withdrawn. They were all dismissed. So we're not quite sure why they're here. They simply were not part of any of the orders in front of this Court. But all we're asking for is a legal mulling on forfeiture, which would obviously be the best. We need not be concerned about the lack of a 54B certification. No, Your Honor, this Court's decision in the United States v. Washington is conclusive on that, that in the context, unlike a normal case, when you have these post-judgment proceedings, these consent decrees that span 70, 80 years, in which there are always ongoing post-judgment proceedings, in that context, 450B is not required, as long as the subset of cases are complete. Thank you. Your rebuttal. Thank you, sir. Your side still has five additional minutes. You can either use them now or expand your rebuttal once you're preferenced. Rebuttal. Rebuttal. Very well. All right. We'll have a first rebuttal by Mr. Hood. And you have five minutes, Mr. Hood. Thank you, Your Honor, and please, the Court. But again, I'm going to have three more minerals get out there and get Judge Gould. Obviously, the focus here is forfeiture. And what's going to be critical for this Court's determination is very carefully to say, Carlos, what it decided and what it did not. You heard from Mr. Shaw, and you heard from Mr. Smeltzer, quoting the language, new protection. Well, there was a new protection added. There was new language grafted onto the existing forfeiture statute that did not exist before the 1995 amendments. Now, the legal effect of that language probably does nothing over and above what the Savings Clause already did, but that was a new set of language that was not already existing. What about Mr. Shaw's argument that that changed the legal rule? Well, it probably doesn't change the legal rule. The language probably doesn't do anything over and above what the Savings Clause already did. What it did was add new language, and that's all the Court did was say, is this retroactively applied? Is it new language, a new protection, that it's a due process violation? It goes through. I would request that the Court take a look at each of these proposed amendments and ask yourself, is the Court actually evaluating, is this a change in existing law? The other thing they talk about is this issue about clarification, and that this is more of a change rather than a clarification. Pay close attention to that portion of the St. Carlos decision. That is in response to Judge Bolt's ruling below, and I would also direct the Court directly, footnote 6, paragraph, sorry, page 8 of the Gila River Indian Community's response to reply brief. There's a link to Judge Bolton's ruling below. It sets the stage for all of this. What you see is Judge Bolton was asked to rule that these new amendments would provide some guidance in terms of interpreting ambiguous law. Is this really, is the preexisting law the same, and these new amendments are barely clarifying the law? The Arizona Supreme Court, while it affirmed Judge Bolton in most respects, this is an area where the Arizona Supreme Court reversed Judge Bolton. Not saying each and every one of these is a change of law, but saying when you have a legislature some 80 years later. In the analogy, the Arizona Supreme Court reversed Judge Bolton. On that one point, Judge Bolton's ruling was, it may be when a specific case of controversy is presented to me, and I'm asked to say, are these 1995 amendments, are they relevant for me to analyze ambiguous law and understand what the legislature meant by previous law? She said, we'll look at that as potentially helping me to construe these provisions. When we get to the question about is it a change in the law, the Arizona Supreme Court reversed on that point saying, we're not going to jump to the falsehood of assuming that today's legislature has any idea what was intended by the legislature in 1919. And so that was the ruling there. There was no finding that these were changes as opposed to clarifications. The point was, if the legislature is active now, that doesn't tell us anything about what the law was 80 years ago, 100 years ago. And again, Judge Bolton, this is set up in more detail in Judge Bolton's trial court order in the special action. So I encourage the court to pay particular attention to that. I also want to note, Mr. Smeltzer referenced the consolidation that occurred in the Arizona Water Code in 1928. And one of the savings clause was eliminated. Well, that was eliminated for redundancy. And I want to make perfectly clear that this point is not lost. The general savings clause covering the entirety of the code remained in place throughout the entirety of Arizona's water history. So the Arizona Supreme Court has ruled time and again that change in 1928 was intended to consolidate and eliminate superfluous provisions, not to affect any substantive change in the law. So I want to make that point very, very clear. Mr. Smeltzer, as he did in his briefs, he tries to equate the concept of beneficial use with somehow providing forfeiture under Arizona law. And those concepts are simply not the same. They're both water law concepts, but the concept of beneficial use does not provide a basis for forfeiture of a water right. All of the cases that we cite over and over again, cloth is the CLOU, GH is the preeminent case. Arizona law did not include forfeiture until 1919. That is abundantly clear. I'm coming down the line here. Mr. Sparks, I want to clarify a question about the prime official burden. I want to be clear. Freiburg did have the initial prime official burden under the change in use rule, and we don't have any problem with that. Again, the fundamental question, and I think this goes to a couple of the questions that were posed to Mr. Sparks, is going through the decree, the protections afforded to the tribe, the water quality injunction, the call system, the testimony of the water commissioner, was that sufficient to meet that initial prime official burden to permit, not to compel, but to permit the inference that the tribe would not be harmed? That's all Freiburg was obligated to do as a prime official matter, and then the burden was supposed to shift. So if anybody has a final question, I'd love to answer it. Otherwise, I'm out of time. Thank you. Appreciate it, Counselor. Counselor, your slide has 10 minutes. Thank you, Your Honor. Let me start again with the issue of forfeiture. In the question that St. Carlos, whether it controls or not, we agree with the arguments that Mr. Shaw made, that it is a definitive statement. It should be deemed controlling. But if this Court finds, as Mr. Hood said, that it is controlling, you don't default then to the law of Nevada. And that's a critical point. We explained it in great detail in our brief, what the pre-1919 law of Arizona was. And we explained that the principle of beneficial use and the notion of forfeiture go hand in glove. Because what the pre-existing law is, is a right. It's just a use of property right of use. Water rights are not possessed in the same way as real property rights or personal property rights. It's a grant, essentially a grant from the state, that you may use water with priority, as long as there's beneficial use of that water. So the beneficial use is a condition on the basis, the measure, and it's the limit of all aspects of abusing a water right. So there's no expectation in that context that if you stop abusing, that you're going to maintain your place in law. And that's what the other state Supreme Courts have held when looking at new forfeiture statutes. We cite in our brief the Hagerman case out of New Mexico, the case out of the Texas Supreme Court, the Texas Water Commission, where they essentially said, look, within the concept of beneficial use is this principle of due diligence. And that what the legislature is doing when they're converting or codifying a rule of forfeiture is simply codifying that use as fundamental to water rights. And let me be clear what's at stake here. What Freeport is saying is that, well, they have decreed water rights for each of their applications, for each of their quarter-quarter parcels that exceed, that are greater than the amount of irrigable acreage within those areas. So they can't use that water on their, those parcels where the decreed rights were a burden. And there's no dispute over it. They haven't used it and they can't use it. And they say they have no duty of due diligence in order to make those parcels capable of allowing that water to be used there again. I mean, in some of these cases, they were rendered non-irrigable by the placement of roads, the placement of canals, the building of structures, and in some instances by the movement of the river. But what Freeport has said is, look, we don't have any obligation to exercise any due diligence in making those areas of the parcel usable again in order that we can use our water right. We can just hang on to this water right ad infinitum. And the problem with that is, is although junior users are able to use the water then that Freeport is not using, no junior user can use that water with any security of right. And that's why it's contrary to the concept of beneficial use. There are essentially people that are ready, willing, and able to beneficially use the water. And Freeport's saying, oh, we can just have this right that we can then use at any time in the future, which will be their fear with your use. And that's just simply contrary to the concept of beneficial use. And in addition to that, as we pointed out in our brief, prior to 1919, there is no state provision that requires a permit or any pre-application in order to go in and assert or to take water, to appropriate water. So any user prior to 1919 always has to look over his or her shoulder at somebody else that's going to try to take that unclaimed water. And so when you look at the 1919 statute and whether it did, for the savings clause, compare the pre-existing rights, you have to look at the 1919 Water Code as a whole and all of the protections that are provided for water users. They no longer have to look over their shoulder at anybody just coming in and using the water that they're not using because the Water Code requires there to be a permit and a process for the commissioner to determine whether this water is appropriate. It's a change in law, sure, and a clarification, but it's not an impairment of a pre-existing right, because there is no pre-existing expectation. And you can maintain your place in law and your priority if you just stop using without any exercise of diligence. If there are no questions on the issue of forfeiture, I'd like to speak briefly to the question of whether a free port meant a or a prima facie showing of no injury to other users. And the place I want to start is with the standard. The counsel says it only needs to show as he permits the inference. Do you agree with that? Permits the inference of no injury. Well, you can get in front of counsel to argue with that. Well, he's trying to make a lesser burden out of this prima facie case, but where I want to first orient the court is that the burden and the standard is to make a prima facie case of no injury to other users, all users on the system, not just the senior user, and not just the ones that show up in a jacket. And the reason that requirement is in the law, because if you change the place of use of the water, right, say you have an irrigation, right, that gives you 100 acre feet of water. If you take that and you're using that 100 acre feet of water next to the river for irrigation, some of that water is going to come back to the river. In the form of return flows. So hypothetically we would say you have a right to divert 100 acres, apply it to particularly near the river, and 30 acre feet come back to the river. So then your actual diminution in terms of what you're taking from the river as per downstream users is only 70, okay? So if you change the place of that use, if you pump that water up over a ridge or you put it someplace further away from the river so you don't have that return flow anymore, what you're doing is making a greater impact on the river because you're still taking the 100 out, but if nothing's coming back, the downstream users no longer get the benefit of that 30 acre feet of return flow. So that's the fundamental reason. Keep track of that 30 acre feet return flow, or is that just? That's part of the privatization burden on them because what happens in terms of acquiring water rights in the river, all the junior users acquire water rights based on the upstream uses. And so they have a right, because your water right is a permit in a particular part of the river, the junior users have a right to expect, and, in fact, all downstream users have a right to expect that the senior place of use is going to operate the same way and it's going to have the same effect on the river, and therefore they know what's in the river. So you don't have to account for that 30 acres, though they may get more. I'm sorry, even though there may be more water if you're saying that they'll use 70 of their 100? What I'm saying is if they've always used 100 in a particular place, 30 has always flowed back to the river. Right. That is what the other users on the river have taken very far rights based on, and 30 coming back to the river. So they're counting on what would otherwise be called an additional 30? They're counting on it because the water right is a permit to that particular land. Right. So it's a water right that's a permit, and it's a water right to use it on that parcel, but the ultimate effect of that water right, that seniority and that priority is to take only 70 of it from the river and to leave 30. And that's why there is a burden of the test to show a prioritization case, to show you're not changing ultimately the flows in the river and the water quality. And what Freeport did in its applications, right, on this question of prioritization of a burden, all they said is, well, we're not changing the dates and the priorities of our water rights. That shows nothing. It says nothing about whether you're impacting the flows in the river, you know, in a way that might impact them. But it goes without saying you cannot transfer more water than you already have, and you can't get a greater priority when you move your water. They completely abdicated on their obligation in their applications. And then when you get to court and when you get to the appeal here, all Freeport is saying now is, well, the tribe is the most senior user on this part of the river, and therefore they can make a call in this water quality injunction that can help protect them. But again, that doesn't meet the burden with respect to all water users. And the district court looked closely at this and determined it didn't even show a crime official case of no injury to the tribe because of the unique circumstances of these transfer applications. And because of the history of this river, which has shown that the ability to make a call by the tribe has not protected  And the water quality injunction, of course, only applies after there has been injury. It only applies to water users in the Safford Valley, and it doesn't even apply to folks in the Dunkinburton Valley. And some of these transfer applications sort of moved from the Safford up to the Dunkinburton. Long story short, the district court took a careful look at all of these that could come up. Freeport never made an effort to make a showing to meet the crime official burden. So my time is up. Your Honors. Thank you, Counsel. Thank you all, Counsel, for helping us with this very complicated case. We appreciate your work very, very much, and we will go to work on trying to sort all of this out. Thank you. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Gould, M. Smith